| | |
|---|---|
| **WILLIAM BEATTY,** ) | |
|     *Plaintiff* ) | |
| ) | |
| **v.** ) | **Dkt. No. 3:20-cv-00067** |
| ) | **JURY DEMANDED** |
| **Y-12 FEDERAL CREDIT UNION,** ) | |
|     *Defendant.* ) | |

## COMPLAINT

COMES NOW the Plaintiff, Mr. William Beatty, by and through the undersigned counsel, and for his complaint against the Defendant, Y-12 Federal Credit Union, does hereby complain and allege as follows.

### I. PARTIES

1. Plaintiff, William Beatty ("Mr. Beatty"), is a citizen and resident of San Diego, California, who was formerly employed by Defendant Y-12 Federal Credit Union.

2. Upon information and belief, Defendant Y-12 Federal Credit Union (the "Credit Union") is a federally chartered, member-owned, non-profit financial cooperative with offices in the following Tennessee counties: Anderson, Blount, Campbell, Knox, Loudon, Roane, Sevier, and Union. The Credit Union's corporate headquarters are located at 501 Lafayette Drive, Oak Ridge, TN 37830.

1

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction to adjudicate Mr. Beatty's claims pursuant to 28 U.S.C. § 1332 because Mr. Beatty and the Credit Union are citizens of different States and the amount in controversy exceeds $75,000.00.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), because the Credit Union is a resident of this judicial district, and under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Mr. Beatty's claims occurred in this judicial district.

## III. FACTS RELEVANT TO ALL CLAIMS

5. Mr. Beatty is a male who was over the age of forty at all times relevant to this Complaint.

6. Mr. Beatty has a BA in Business Administration and an MBA in Business Administration and Management.

7. On June 4, 2018, Mr. Beatty was hired by the Credit Union.

8. During the entire time that Mr. Beatty was an employee of the Credit Union, he was paid a salary, was eligible for bonuses, and participated in the Credit Union's retirement and pension plans.

9. Before becoming an employee of the Credit Union, Mr. Beatty had spent more than twenty years working in the banking and finance industries. Prior to becoming an employee of the Credit Union, Mr. Beatty had spent a substantial number of years leading member and customer service teams and serving in other executive roles at large financial institutions such as Bank of America and CertusBank

10. Once he became an employee of the Credit Union, Mr. Beatty worked, first as Director of Remote Services, and then as the Director of Member Service Center.

11. Given Mr. Beatty's education and extensive career in the banking and finance industries, he was well-qualified for the forgoing job positions.

12. Mr. Beatty directly supervised three employees who, together, led a team of around thirty-five people providing services and support to Credit Union members.

13. During the entire time that Mr. Beatty was an employee of Credit Union, he met or exceeded expectations in performing his job duties and received positive performance reviews.

14. In January 2019, Mr. Beatty was elected by his coworkers to sit on the Board of the Y-12 Cares Foundation, a separate, non-profit foundation that facilitates the charitable endeavors of the Credit Union and its employees.

15. In March 2019, the Y-12 Cares Foundation Board elected Mr. Beatty to serve as its Chairman.

16. Initially, Mr. Beatty was supervised by Mr. Keith Troup, the chief operating officer (COO) of the Credit Union. In mid-January 2019, the Credit Union terminated Mr. Troup's employment, and Ms. Stephanie Zuleger, the Chief Experience Officer, became Mr. Beatty's supervisor.

17. Upon information and belief, at all times relevant to this Complaint, Ms. Zuleger was a female in her early-to-mid-thirties.

18. At all times relevant to this Complaint, Ms. Zuleger reported directly to the Credit Union's CEO, Mr. Mark Ziegler.

19. Once Ms. Zuleger became Mr. Beatty's supervisor, she had the authority to terminate his employment, alter his compensation, and otherwise substantially alter the terms and conditions of his employment.

20. Ms. Zuleger directly supervised approximately eight employees--two males and six females. Upon information and belief, as Chief Experience Officer, Ms. Zuleger indirectly supervised multiple departments comprised of approximately 200 employees, most of which were female.

21. Once Ms. Zuleger became Mr. Beatty's supervisor, he noticed that female employees over which she had supervisory authority received better treatment than male employees.

22. For example, upon information and belief, Ms. Zuleger used her authority and influence to cause a female, who upon information and belief, had little or no human resources experience, to be promoted to the position of Director of Human Resources instead of following the Credit Union's normal hiring process of posting the job internally and externally so that other employees would have an opportunity to be considered for the position.

23. Mr. Beatty also observed Ms. Zuleger being very disrespectful and demeaning in her oral and written interactions with male employees, including Mr. Beatty himself.

24. Ms. Zuleger generally did not treat female employees in a disrespectful and demeaning manner, with the exception of one female employee who was of a different national origin than the other female employees.

25. Upon information and belief, Ms. Zuleger treated male employees in a discriminatory manner with the Credit Union's knowledge and acquiescence.

26. For example, in early, 2019, Ms. Zuleger terminated the other male employee who she directly supervised, purportedly for performance issues and demoted another male employee. Upon information and belief, Ms. Zuleger was also instrumental in having Mr. Troup and another male employee fired.

27. On January 24, 2019, Mr. Beatty made a written complaint about Ms. Zuleger's conduct to the Y-12 Supervisory Committee, the Credit Union's CEO, Mr. Mark Ziegler, and the Credit Union's Chief Administrative Officer, Ms. Valerie Walls.

28. The Y-12 Supervisory Committee is an independent organization which reports to the National Credit Union Administration (the "NCUA"), which is the federal regulatory agency which oversees federally chartered credit unions and conducts annual audits to ensure compliance with federal regulations.

29. Upon information and belief, the Y-12 Supervisory Committee is the proper channel for the Credit Union's employees to report discrimination and harassment or other concerns about the Credit Union's executive-level employees.

30. Mr. Beatty's written complaint stated that Ms. Zuleger created a hostile work environment and complained about the promotion of the female employee to the Director of Human Resources position without following the proper processes for advertising the position to other employees.

31. CEO Ziegler, CAO Walls, and the Y-12 Supervisory Committee were aware that Mr. Beatty was the one who made the written complaint because he included his name and phone number on the complaint and sent the complaint from his personal e-mail address which contains his full name.

5

32. On January 25, 2019, the day after he filed the complaint, Mr. Beatty was called into an unscheduled meeting with Ms. Zuleger and Jon Chandler, a Human Resources employee, purportedly to talk about an "employee complaint" that someone had made that Mr. Beatty was not supportive of them.

33. Upon information and belief, Ms. Zuleger and Mr. Chandler's statement that they had received complaints from other employees about Mr. Beatty's lack of supportiveness was false and pretextual and intended to intimidate Mr. Beatty because he filed a complaint with the Y-12 Supervisory Committee and Ms. Zuleger's supervisor.

34. In January 2019, Mr. Beatty also made an oral complaint to the Y-12 Supervisory Committee about the fact that the Credit Union failed to make required deposits into employee 401k accounts.

35. In February 2019, Ms. Brittney Hanson, an employee in the Credit Union's Human Resources Department contacted Mr. Beatty and indicated that they had opened an investigation of Ms. Zuleger. Mr. Beatty expressed concern about retaliation because Ms. Zuleger was his supervisor, and he was assured that everything would be kept confidential and that there would be no retaliation.

36. On February 20, 2019, Ms. Hanson met with Mr. Beatty a second time to obtain more information for the investigation of Ms. Zuleger. Again, Mr. Beatty was cooperative and forthcoming, and again Mr. Beatty expressed concerns about retaliation.

37. Two weeks later, on or around March 6, 2019, Mr. Beatty was called into another unscheduled meeting with Ms. Zuleger and Mr. Chandler.

38. Ms. Zuleger informed Mr. Beatty that he could either accept a performance improvement plan or he could terminate his employment and receive a severance package. At that

6

time, he was not provided any details about the proposed severance package or the performance improvement plan.

39. During that meeting, Mr. Beatty asked to speak to CEO Ziegler or CAO Walls, and he was informed that both knew about the options (termination or performance improvement plan) and supported the decision.

40. Mr. Beatty reported this meeting to Ms. Hanson in Human Resources and stated that he believed this meeting was in retaliation for his complaint about Ms. Zuleger and his participation in the investigation of Ms. Zuleger.

41. On March 18, 2019, Mr. Beatty was provided with a copy of the performance improvement plan.

42. The performance improvement plan contained blatantly false statements about Mr. Beatty's performance and included over twenty different tasks that Mr. Beatty was supposed to complete in the next three months—many within only eight weeks. Many of the tasks were outside the scope of Mr. Beatty's job description for his position.

43. Upon information and belief, no similarly situated female employees of the Credit Union were placed on a performance improvement plan by Ms. Zuleger or were required or expected to perform substantially more tasks in addition to their job duties listed on their job description.

44. Upon information and belief, no similarly situated employees of the Credit Union younger than Mr. Beatty were placed on a performance improvement plan by Ms. Zuleger or were required or expected to perform substantially more tasks in addition to their job duties listed on their job description.

45. Upon information and belief, no employees of the Credit Union who did not complain about the hostile work environment created by Ms. Zuleger or who did not participate in the investigation of Ms. Zuleger were placed on a performance improvement plan or were required or expected to perform substantially more tasks in addition to their job duties listed on their job description.

46. The contents of the performance improvement plan and the performance improvement plan itself were discriminatory, were part of a pattern and practice of harassment and retaliation against Mr. Beatty and were merely a pretext for the Credit Union's discrimination and harassment of Mr. Beatty and its retaliation against him.

47. One of the requirements of the performance improvement plan was that Mr. Beatty immediately resign from his position as the Chair of the Y-12 Cares Foundation. Mr. Beatty declined to do so because he had been elected to this position by his peers and because his position on the Foundation had nothing to do with his employment by the Credit Union.

48. Upon information and belief, at all times relevant to this Complaint, no similarly situated female employees of the Credit Union were required to resign from being a director or officer of the Y-12 Cares Foundation as a condition of employment with the Credit Union.

49. Upon information and belief, at all times relevant to this Complaint, no similarly situated employees of the Credit Union younger than Mr. Beatty were required to resign from being a director or officer of the Y-12 Cares Foundation as a condition of employment with the Credit Union.

50. Upon information and belief, at all times relevant to this Complaint, no employees of the Credit Union who did not complain about the hostile work environment created by Ms. Zuleger or who did not participate in the investigation of Ms. Zuleger were required to resign from

8

being a director or officer of the Y-12 Cares Foundation as a condition of employment with the Credit Union.

51. Because Mr. Beatty declined to resign as the elected Chair of the Y-12 Cares Foundation Board, on April 1, 2019, Chief Administrative Officer, Valerie Walls, contacted each member of the Y-12 Cares Foundation Board via e-mail stating as follows:

> To the Board:
> A meeting via E-Mail is being called for the purpose of removing a director. A Motion is being made to remove Bill Beatty as Chairman of the Board. Pursuant to the Foundation bylaws (Section 4.06 Removal of Directors), this requires a majority vote.
>
> Bill is working with his manager on a plan to improve his performance. Bill was offered to resign from the board and has declined that offer. It is believed by Credit Union management to be in the best interests of the organization and Bill that extracurricular activities, including serving on the board, be removed so that full focus can be put on satisfying the performance plan.
>
> Using the voting buttons embedded in this e-mail, please vote 'Yay' or 'Nay' by **9am tomorrow (Tuesday, April 2, 2019)**. Should we obtain a majority vote, Bill will be removed and Mark Carter will serve as the Chairman until another election is held on April 10th.

52. Upon information and belief, Chief Administrative Officer Walls also contacted many of the Board members separately conveying the same or similar message regarding Mr. Beatty and communicating that the Credit Union's attorney and Mr. Beatty's attorney had approved this communication.

53. The foregoing representations about Mr. Beatty are false because, at the time the forgoing e-mail and communications were made, Mr. Beatty was not subject to a performance improvement plan but his attorney was still negotiating the terms of the performance improvement plan with the Credit Union's attorney in an attempt to make them less onerous and retaliatory.

9
1722831v4
Case 3:20-cv-00067-HBG   Document 1   Filed 02/18/20   Page 9 of 18   PageID #: 9

Furthermore, Mr. Beatty's attorney was not given the opportunity to review the e-mail to the Board before it was sent and did not approve it.

54. The foregoing representations about Mr. Beatty are defamatory because they were intended to injure his reputation within the Credit Union and within the larger community of the Y-12 Cares Foundation.

55. Mr. Beatty was given no opportunity to contest Ms. Walls' false and defamatory statements, and based on Ms. Walls' false and defamatory statements, the Y-12 Cares Foundation Board removed Mr. Beatty both as its Chair and as a member of the Board.

56. During this entire time, Mr. Beatty continued to perform all of his job duties in a satisfactory manner.

57. On April 15, 2019, Ms. Zuleger and Mr. Chandler called Mr. Beatty into another unscheduled meeting. Ms. Zuleger informed Mr. Beatty that the Credit Union was terminating his employment effective immediately.

58. Upon information and belief, Mr. Beatty was replaced by a younger, female employee who had no prior experience in the role formerly held by Mr. Beatty.

59. Upon information and belief, Mr. Beatty was fired because of his age and gender and in retaliation for his having complained about a hostile work environment and participated in the investigation of Ms. Zuleger.

60. In July 2019, the Credit Union posted a job opening for the Chief Experience Officer position. The job duties described in the posting were similar to the job duties formerly performed by Mr. Beatty.

61. Mr. Beatty satisfied all of the qualifications and requirements listed for the Chief Experience Officer position including having the requisite education and experience, including having worked as the Chief Experience Officer at one of his past employers.

62. On July 4, 2019, Mr. Beatty applied for the job of Chief Experience Officer.

63. The Credit Union never even contacted Mr. Beatty with regards to his application or scheduled him for an interview.

64. On August 15, 2019, the Credit Union sent Mr. Beatty an e-mail informing him that he was not considered for the job because his "skills and experience do not meet the job requirements."

65. Given Mr. Beatty's extensive experience in the banking and finance industry and his prior experience working for the Credit Union, the Credit Union's reason for not even interviewing Mr. Beatty for the position is false and pretextual.

66. Upon information and belief, Mr. Beatty was not considered or interviewed for the Chief Experience Officer position because of his age and gender and in retaliation for his having complained about a hostile work environment and participated in the investigation of Ms. Zuleger.

## IV. CAUSES OF ACTION

### COUNT 1: SEX DISCRIMINATION AND RETALIATION UNDER THE TENNESSEE HUMAN RIGHTS ACT, TENN. CODE ANN. § 4-21-101, *et seq.*

67. Mr. Beatty incorporates all of the allegations of Paragraphs 1-66 and further alleges as follows.

68. At all times relevant to this Complaint, Mr. Beatty was a male.

69. At all times relevant to this Complaint, the Credit Union employed more than eight (8) employees within the state of Tennessee.

70. From June 4, 2018 to April 15, 2019, Mr. Beatty was an employee of the Credit Union.

71. At all times relevant to this Complaint, Mr. Beatty was fully qualified to perform the job duties of each job position which he held while an employee of the Credit Union.

72. At all times relevant to this Complaint, Mr. Beatty did, in fact, perform the job duties of each job position which he held while an employee of the Credit Union in at least a satisfactory manner and received positive performance reviews as a result.

73. Beginning in January 2019, Mr. Beatty was supervised by Chief Experience Officer Stephanie Zuleger who was a female at all times relevant to this Complaint.

74. As described in the preceding paragraphs, beginning in January 2019, Mr. Beatty received less favorable treatment by his supervisor, Chief Experience Officer Stephanie Zuleger, than other, similarly situated female employees.

75. Ms. Zuleger's negative treatment of Mr. Beatty and other male employees created a hostile work environment for Mr. Beatty and other male employees.

76. Mr. Beatty complained of Ms. Zuleger's discriminatory treatment of Mr. Beatty and other employees and the hostile work environment which she created to the Credit Union's CEO, its Chief Administrative Officer, and to the independent Y-12 Supervisory Committee.

77. Mr. Beatty also complained of Ms. Zuleger's discriminatory treatment and the hostile work environment to the Credit Union's Human Resources Department and participated in the investigation of Ms. Zuleger.

78. Shortly after Mr. Beatty made his complaints of discrimination and hostile work environment, the Credit Union took adverse employment action against Mr. Beatty, first by requiring him to choose between termination and a performance improvement plan and then by

12

1722831v4
Case 3:20-cv-00067-HBG    Document 1    Filed 02/18/20    Page 12 of 18    PageID #: 12

pressuring him to accept a performance improvement plan which was onerous and included requirements outside the scope of his job duties.

79. The Credit Union took additional adverse employment actions against Mr. Beatty by making false and defamatory statements about him in order to orchestrate his removal as Chair of the Y-12 Cares Foundation Board.

80. Upon information and belief, no other similarly situated female employees of the Credit Union were treated so negatively and, in fact, the female employees supervised by Ms. Zuleger generally were treated favorably.

81. The Credit Union took further adverse employment actions against Mr. Beatty by abruptly terminating his employment and replacing him with a younger, female employee who, unlike Mr. Beatty, had no prior experience in the role of Director, Member Service Center.

82. The Credit Union further retaliated against Mr. Beatty by refusing to interview or hire him for the position of Chief Experience Officer even though he was well-qualified for that position.

83. All of the foregoing constitutes unlawful discrimination and harassment because of Mr. Beatty's sex and in retaliation for Mr. Beatty's complaining about the discrimination and hostile work environment and participating in the investigation of Ms. Zuleger, in violation of the Tennessee Human Rights Act.

84. As a direct and proximate result of the Credit Union's violations of the Tennessee Human Rights Act, Mr. Beatty has suffered damages for which the Credit Union is liable, including lost back wages and future wages, lost benefits humiliation, anxiety, inconvenience, pain and suffering, emotional distress, loss of enjoyment of life, attorneys' fees and costs and all such other remedies as shall be necessary and proper.

## COUNT 2: AGE DISCRIMINATION AND RETALIATION UNDER THE TENNESSEE HUMAN RIGHTS ACT, TENN. CODE ANN. § 4-21-101, *et seq.*

85. Mr. Beatty incorporates all of the allegations of Paragraphs 1-84 and further alleges as follows:

86. At all times relevant to this Complaint, Mr. Beatty was over forty years of age.

87. At all times relevant to this Complaint, Mr. Beatty's supervisor, Chief Experience Officer Stephanie Zuleger was significantly younger than him and in her early-to-mid thirties.

88. As described in the preceding paragraphs, beginning in January 2019, Mr. Beatty received less favorable treatment by his supervisor, Chief Experience Officer Stephanie Zuleger, than other, similarly situated employees who were younger than him.

89. Ms. Zuleger's negative treatment of Mr. Beatty created a hostile work environment for Mr. Beatty.

90. Mr. Beatty complained of Ms. Zuleger's discriminatory treatment of Mr. Beatty and other employees and the hostile work environment which she created to the Credit Union's CEO, its Chief Administrative Officer, and to the independent Y-12 Supervisory Committee.

91. Mr. Beatty also complained of Ms. Zuleger's discriminatory treatment and the hostile work environment to the Credit Union's Human Resources Department and participated in the investigation of Ms. Zuleger.

92. Shortly after Mr. Beatty made his complaints of discrimination and hostile work environment, the Credit Union took adverse employment action against Mr. Beatty, first by requiring him to choose between termination and a performance improvement plan and then by

pressuring him to accept a performance improvement plan which was onerous and included requirements outside the scope of his job duties.

93. The Credit Union took additional adverse employment actions against Mr. Beatty by making false and defamatory statements about him in order to orchestrate his removal as Chair of the Y-12 Cares Foundation Board.

94. Upon information and belief, no other similarly situated employees of the Credit Union younger than Mr. Beatty were treated so negatively and, in fact, the younger employees supervised by Ms. Zuleger generally were treated favorably.

95. The Credit Union took further adverse employment actions against Mr. Beatty by abruptly terminating his employment and replacing him with a younger, female employee who, unlike Mr. Beatty, had no prior experience in the role of Director, Member Service Center.

96. The Credit Union further retaliated against Mr. Beatty by refusing to interview or hire him for the position of Chief Experience Officer even though he was well-qualified for that position.

97. All of the foregoing constitute unlawful discrimination and harassment because of Mr. Beatty's age and in retaliation for Mr. Beatty's complaining about the discrimination and hostile work environment and participating in the investigation of Ms. Zuleger, in violation of the Tennessee Human Rights Act.

98. As a direct and proximate result of the Credit Union's violations of the Tennessee Human Rights Act, Mr. Beatty has suffered damages, lost back wages and future wages, lost benefits humiliation, anxiety, inconvenience, pain and suffering, emotional distress, loss of enjoyment of life, attorneys' fees and costs and all such other remedies as shall be necessary and proper.

## COUNT 3: VIOLATION OF THE TENNESSEE PUBLIC PROTECTION ACT, TENN. CODE ANN. § 50-1-301, *et seq.*

99. Mr. Beatty incorporates all of the allegations of Paragraphs 1-98 and further alleges as follows:

100. Mr. Beatty is an "employee" of the Credit Union within the meaning of Tennessee Code Annotated § 50-1-304(1).

101. By engaging in discriminatory, harassing, and retaliatory conduct in violation of the Tennessee Human Rights Act, the Credit Union engaged in "illegal activities" within the meaning of Tenn. Code Ann. 50-1-304(3).

102. Mr. Beatty refused to remain silent about the Credit Union's illegal activities by reporting these illegal activities to the Y-12 Supervisory Committee and to the Credit Union's CEO and Chief Administrative Officer.

103. The Credit Union terminated Mr. Beatty's employment solely in retaliation for his refusing to remain silent about the Credit Union's illegal activities.

104. The Credit Union's conduct constitutes a violation of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

105. As a result of the Credit Union's unlawful conduct, Mr. Beatty has sustained damages, lost back wages and future wages, lost benefits, humiliation, anxiety, inconvenience, pain and suffering, emotional distress, and loss of enjoyment of life, attorneys' fees and costs and all such other remedies as shall be necessary and proper.

## COUNT 4: DEFAMATION

106. Mr. Beatty incorporates all of the allegations of Paragraphs 1-105 and further alleges as follows:

107. On or about April 1, 2019, the Credit Union, by and through its Chief Administrative Officer, made false and defamatory statements about Mr. Beatty as further described in Paragraph 51 and Paragraph 52.

108. The foregoing false and defamatory statements were made to the members of the Y-12 Cares Foundation Board and, upon information and belief, were made to Credit Union employees and members of the Y-12 Supervisory Committee.

109. The Credit Union knew these statements were false when they were made and knew that such statements would damage Mr. Beatty's reputation.

110. These false and defamatory statements caused Mr. Beatty to lose his position as the Chair of the Y-12 Cares Foundation Board and also caused him substantial reputational harm which thereby hindered his ability to secure employment after the Credit Union terminated his employment.

111. As a result of the Credit Union's defamation of Mr. Beatty, Mr. Beatty has sustained actual damages in an amount to be proven at trial.

## V. PRAYERS FOR RELIEF

**NOW THEREFORE**, having fully stated his claims against the Defendant Credit Union, Plaintiff William Beatty prays that this Court would award him relief as follows:

1. That proper process be issued and served upon the Defendant;

2. That the Defendant be required to answer this Complaint within the time and in the manner required by law;

3. That this Court would empanel a jury to try all issues that are properly triable by a jury under Tennessee law;

4. That this Court would award Plaintiff all damages to which he is entitled including, but not limited to, compensatory damages, lost back wages and future wages, lost benefits, and damages for humiliation, anxiety, inconvenience, pain and suffering, emotional distress, loss of enjoyment of life, and reputational harm in an amount to be determined at trial, but not less than $2,000,000.00;

5. That this Court would award Plaintiff pre-judgment interest and post-judgment interest;

6. That this Court would award Plaintiff all of his attorneys' fees and costs pursuant to Tenn. Code Ann. § 4-21-306(a)(7) and § 50-1-304(c)(2);

7. That this Court would tax all costs to Defendant; and

8. That this Court would award to Plaintiff such other and further relief to which he may be entitled under law, in equity, or as the Court deems just and appropriate.

**RESPECTFULLY SUBMITTED** this the 18th day of February, 2020.

>  */s/    Melissa B. Carrasco*
> Melissa B. Carrasco (BPR # 029094)
> Penny Arning (BPR # 017874)
> EGERTON, MCAFEE, ARMISTEAD & DAVIS, P.C.
> 900 S. Gay Street, 14th Floor
> Knoxville, TN 37902
> Phone: (865) 546-0500
> Fax: (865) 525-5293
> E-Mail: mcarrasco@emlaw.com
>           parning@emlaw.com
> *Attorneys for Plaintiff*